**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No.  22-188 |
| | ) | |
| DEIAN WOFFORD | ) | |

### Opinion and Order on Motion to Suppress Physical Evidence

Defendant Deian Wofford is charged in a three-count Indictment with possession with intent to distribute illegal controlled substances, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(c), and (b)(2)(g)(1), using and carrying a firearm during and in relation to, and possessing a firearm in furtherance, of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i), and possession of a firearm and ammunition by a convicted felon, in violation of 18 U.S.C. § 922(g)(1).  ECF No. 3.  In the afternoon of October 14, 2021, Mr. Wofford was driving a silver Mercedes Benz SUV in the Manchester area of Pittsburgh.  There were two passengers in the vehicle with Mr. Wofford.  At approximately 4:30 p.m., Pittsburgh Police Officer Dustin Brozell observed that the SUV had an expired registration  and then conducted a traffic stop of the vehicle based on the expired registration.  During the course of the traffic stop, Officer Brozell recovered a firearm and ammunition, ten stamp bags of heroin, and $1,021 dollars from Mr. Wofford's person.  Officer Brozell also recovered a firearm from the front seat passenger, co-defendant Floyd Younger.  A subsequent search of the vehicle, as authorized by a warrant, recovered a small amount of marijuana, 550 stamp bags of heroin, and ammunition.

Mr. Wofford filed a Motion to Suppress Physical Evidence, in which he seeks to suppress all physical evidence seized as a result of the October 14, 2021 traffic stop.  ECF No. 68.  The government filed a Response to the Motion.  ECF No. 74.  A hearing on the motion

was held on February 27, 2024.  ECF Nos. 94, 97.  At the hearing, testimony was presented

from Pittsburgh Police Officer Brozell.  Thereafter, the defense and the government filed post-

hearing briefs.  ECF Nos. 98, 99.   After consideration of the pleadings, exhibits, the

testimony offered at the hearing, and the arguments of counsel, and for the reasons that

follow, Defendant's Motion will be denied.

### I.  Background

At the time of the traffic stop on October 14, 2021, Officer Dustin Brozell had been

employed as a police officer with the Pittsburgh Police Department since December 2017.  Tr.

Supp. Hrg, Feb. 27, 2024, at 3 (ECF No. 97).  At the time of the hearing, he had been a police

officer for approximately ten years and testified that he has been involved with over one

hundred drug arrests and "a couple [of] dozen" firearm arrests.  Tr. 3, 4-5.

On October 14, 2021, Officer Brozell was alone in a marked police vehicle on active

patrol in the Manchester neighborhood of Pittsburgh.  Tr. 4.  He testified that the Pittsburgh

Police were conducting more patrols in that area due to a shooting that had occurred the

previous night.  Tr. 4.  Officer Brozell described the Manchester neighborhood as a high

crime area, particularly with respect to violent crimes.  Tr. 5.  He testified the neighborhood is

also known for open air narcotics transactions.  Tr. 5.

At approximately 4:30 p.m. Officer Brozell observed "heavy tint" on the windows of a

moving silver Mercedes Benz.  Tr. 5.  He checked the registration of the vehicle and

discovered that the registration had expired, and he decided to conduct a traffic stop.  Tr. 5.

He activated his lights and sirens, and the vehicle pulled over at the intersection of Chateau

and Columbus.  Tr. 6.  Officer Brozell, in uniform, approached the vehicle.  Tr. 6.  The stop

was recorded on Officer Brozell's body camera.  Tr. 6; Body Cam Video (Gov. Ex. 1).  Due to the fact that the stop occurred in a high crime area, and because Officer Brozell was unable to see how many occupants were in the vehicle (due to heavily tinted windows), he called for assistance from another police unit.  Tr. 8.

As he approached the driver, Officer Brozell asked, "would you put all the windows down?"  Body Cam Video 1:03-1:09.  Tr. 8.  With the windows open, Officer Brozell was able to see that there were three males in the vehicle.  Tr. 8.  He testified that he "detected a strong odor of marijuana upon approaching the vehicle."  Tr. 8, 9.  When Officer Brozell encountered Mr. Wofford, the driver of the vehicle, Mr. Wofford gave Officer Brozell his driver's license.  Body Cam Video 1:13.  Officer Brozell testified that all three occupants displayed nervousness, to include lack of eye contact and heavy breathing.  Tr. 10.

Officer Brozell did not tell the occupants of the vehicle that he smelled the odor of marijuana, as he did not want to increase the chance that they would flee while he was checking Mr. Wofford's identification.  Tr. 9.  Officer Brozell returned to his patrol car to check the driver's license validity and to check for any outstanding warrants.  Tr. 9, 10, 21.  Mr. Wofford's' license was valid, and he had no outstanding warrants.  Tr. 21.

While he was in his patrol car verifying Mr. Wofford's driver's license, Officer Brozell requested additional backup units, as he was going to talk to the occupants individually, outside of the other occupants' presence.  Tr. 10-11.  He testified that, because of the odor of marijuana and the demeanor of the occupants, he intended to question them at the rear of the vehicle.  Tr. 10.  When Officer Brozell returned to the vehicle, he told Mr. Wofford, "I can smell marijuana coming from the vehicle, you guys have any weed on you?"

Body Cam Video 4:38.  Mr. Wofford replied that he did not have any weed, and Officer

Brozell asked him to come to the back of the vehicle to talk.  Body Cam Video 4:55; Tr. 11.

At the rear of the vehicle, Officer Brozell again told Mr. Wofford, "I can smell marijuana in

the vehicle."  Body Cam Video 5:16.  Mr. Wofford denied that marijuana was in the vehicle,

and he stated that not only had no one smoked marijuana in the vehicle, but also that he does

not permit anyone to smoke marijuana in the vehicle.  Body Cam Video 5:17-5:24; 6:11-7:13.

Officer Brozell explained to Mr. Wofford that, in Pennsylvania, the smell of marijuana

provides "probable cause to get a search warrant for the vehicle," but Mr. Wofford could

instead consent to a search of the vehicle.  Body Cam Video 5:28-5:32; Tr. 12.  Mr. Wofford

declined to give his consent to search.  Tr. 12; Body Cam Video 5:35-37.

   As Officer Brozell explains to Mr. Wofford that he has cause to apply for a search

warrant, Mr. Wofford starts to walk away from Officer Brozell towards the sidewalk and the

passenger side of the car.  Body Cam Video 8:02:  Officer  Brozell yells, "hey, hey ,hey, hey

hey, hang out the back, I don't want you going behind my partner."  Body Cam Video 8:03-

07.  Upon hearing Officer Brozell, Mr. Wofford immediately stopped and returned to his

original position at the rear of the vehicle.  Body Cam Video 8:05.

   Officer Brozell then asked the other two occupants to exit the vehicle so that the

vehicle could be seized in anticipation of procuring a search warrant.  Tr. 13.  He conducted a

pat-down of the front seat passenger, co-defendant Floyd Younger, because he saw that Mr.

Younger's fanny pack was hanging low "as if there[ was] a weighted object in there."  Tr. 13-

14.  Based on his knowledge that fanny packs are often used to carry firearms, Officer Brozell

"felt it reasonable that there was a firearm in that fanny pack."  Tr. 14; *see also* 12, 35-36.

Officer Brozell also testified that Mr. Younger was "extremely nervous throughout the entire traffic stop," he "failed to maintain eye contact," and he was "breathing at a rapid rate."  Tr. 14.  Officer Brozell recovered a loaded Ruger handgun from Mr. Younger's fanny pack. Based upon the presence of the firearm, and, because he did not know if there were other firearms in the vehicle, Mr. Wofford was placed in handcuffs for officer safety.  Tr. 14.

Officer Brozell testified that, once Mr. Younger's firearm was discovered, Mr. Wofford's demeanor and behavior changed, in that he threw his hands up and became extremely nervous.  Tr. 14.  The video shows that, as Mr. Younger is being handcuffed, Mr. Wofford, with hands partially raised, briefly moved to the passenger side of the vehicle, still staying in the rear, to view what was happening.  Body Cam 9:07-9:08.  Then, as Mr. Younger is being escorted past Mr. Wofford's vehicle, with an Officer between him and Mr. Younger, Mr. Wofford has both of his arms partially raised.  Body Cam 9:19.  As the escort passes by, Mr. Wofford puts his hands down.  Body Cam 9:22.  As Officer Brozell starts to pass by Mr. Wofford with Mr. Younger's firearm, Mr. Wofford raises both hands into the air, in a "don't shoot" gesture.  9:27.  From Mr. Wofford's point of view, it looked like Officer Brozell was aiming a firearm at him.  He put his arms down once Officer Brozell explains that the firearm is Mr. Younger's and when the Officer standing beside Mr. Wofford tells him that Officer Brozell's firearm was still in his holster.  9:30-9:34.

Just after Mr. Younger's firearm was recovered, Officer Brozell informed Mr. Wofford that he was being detained and was going to place handcuffs on him:

Officer Brozell: Deian, because of what your boy had on him, we're going to have you put your hand behind your back, and you're going to be detained, okay?"

Mr. Wofford: Detained?

Officer Brozell: Detained.

Officer Brozell: Not under arrest, detained.

Body Cam 9:47-9:57.  On the video, it appears that Mr. Wofford begins to turn to put his hand behind his back, but at the word "detained," he turns back towards Officer Brozell and to ask, "detained?"  Body Cam 9:51.  Although Mr. Wofford's actions are brief, it appears that it prompted two other Officers to approach Mr. Wofford to physically assist with getting him into position for the placement of handcuffs.  Body Cam 9:53-9:55.

Once Mr. Wofford was handcuffed, Officer Brozell explained to him that, because the firearm was discovered on Mr. Younger's person, the gun , "is not anything you're going to be caught up on."  Body Cam 10:06-10:09.  Officer Brozell conducted a pat-down search of Mr. Wofford, immediately feeling that his fanny pack contained a weapon.  Body Cam 10:24-10:25.  He opened the fanny pack and found a loaded Glock handgun with an extended magazine.  Tr. 15.  Officer Brozell asked Mr. Wofford if he had a license to carry the firearm.  Tr. 15.  Mr. Wofford was not authorized to carry the firearm; and so, Mr. Wofford was placed under arrest and searched incident to the arrest.  Tr. 15-16.  The subsequent search of Mr. Wofford uncovered fifty stamp bags of heroin and $1,021 in United States currency.  Tr. 16.

Officer Brozell applied for and procured a search warrant, authorizing a nighttime search of the vehicle.  Tr. 16.  The vehicle was searched at the Zone 1 impound lot at approximately 11:05 p.m.  Tr. 17.  Law enforcement recovered approximately 550 stamp bags of heroin, a small amount of marijuana and a Glock magazine.  Tr. 18.  The video of the search

of the vehicle shows Officer Gardocki searching the interior of the passenger side.  Officer Gardocki, who was assisting with the search of the vehicle, twice, spontaneously mentioned that he "smelled weed." Tr. 17–18.

## II. <u>Discussion</u>

Mr. Wofford argues that Officer Brozell unlawfully extended the traffic stop by investigating matters unrelated to the reason for the stop.  He argues that the purposes of the traffic stop were completed once Officer Brozell confirmed that Mr. Wofford did not have any outstanding warrants.  At that point, the "*Rodriguez* moment," Officer Brozell should have issued a traffic citation, or a warning, for the expired registration.  Instead, Mr. Wofford argues that Officer Brozell deviated from the traffic stop mission, and without justifiable reasonable suspicion of criminal activity, detained the occupants of the vehicle.

In support, Mr. Wofford argues that Officer Brozell's testimony is not credible.  First, he argues that Officer Brozell's testimony that Mr. Wofford displayed signs of nervousness is contradicted by the body cam video evidence.  Next, Mr. Wofford contends that, by establishing that Officer Brozell's testimony as to "nervousness" is not credible, Officer Brozell's testimony that he smelled marijuana coming from the vehicle is also not credible.  Mr. Wofford also argues that Officer Brozell's credibility is further undermined, based upon the fact that only a small, plastic wrapped baggie of marijuana was recovered from inside the console of the vehicle.  Mr. Wofford concludes that, lacking any credible testimony to support reasonable suspicion of criminal activity, Officer Brozell violated the Fourth Amendment by unjustifiably extending the traffic stop beyond the "*Rodriguez* moment."  Finally, regardless of the credibility of Officer Brozell's testimony, Mr. Wofford argues that Officer Brozell also lacked a legal justification for the pat down of Mr. Wofford.

7

### A.       Fourth Amendment

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and
> effects, against unreasonable searches and seizure, shall not be violated, and no
> Warrants shall issue, but upon probable cause, supported by Oath or
> affirmation, and particularly describing the place to be searched, and the
> persons or things to be seized.

U.S. Const. Amend. IV.  "The United States Supreme Court has held that stopping a car and detaining its occupants is a seizure under the Fourth Amendment."  *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995) (citing *United States v. Hensley*, 469 U.S. 221, 226 (1985). "[A] stop to check a driver's license and registration is constitutional when it is based on an 'articulable and reasonable suspicion that ... either the vehicle or an occupant' has violated the law."  *Johnson*, 63 F.3d at 245 (quoting *Delaware v. Prouse*, 440 U.S. 648, 663 (1979)).  In *Terry v. Ohio*, the Supreme Court held that a brief investigatory warrantless search, based on less than probable cause, is permissible under the Fourth Amendment where a police officer has a *reasonable, articulable suspicion that criminal activity is afoot*.  *Terry v. Ohio*, 392 U.S. 1, 30 (1968) (emphasis added), *see also United States v. Yamba*, 506 F.3d 251, 255 (3d Cir. 2007).

### B.       Stop of the Vehicle

Officer Brozell initiated a traffic stop of Mr. Wofford's vehicle after he confirmed that the vehicle's registration had expired.  Therefore, the defense concedes, and the Court finds, that Officer Brozell "possessed specific, articulable facts that [Mr. Wofford] was violating a traffic law at the time of the stop;" and therefore, the stop of the vehicle was justified.  *Delfin-Colina*, 464 F.3d at 398.

### C.     Officer Brozell's Testimony and Video Evidence

Initially, Officer Brozell testified that, before he observed or interacted with Mr. Wofford, he "detected a strong odor of marijuana upon approaching the vehicle." Tr. 8, 9 (first smelled odor of marijuana "[u]pon approaching the vehicle, towards the rear"). Thus, before he had an opportunity to observe any alleged signs of nervousness, Officer Brozell had probable cause to search the vehicle based upon the odor of marijuana. *United States v. Ramos*, 443 F.3d 304, 308 (3d Cir. 2006) ("It is well settled that the smell of marijuana alone, if articulable and particularized, may establish not merely reasonable suspicion, but probable cause"). It was only after Officer Brozell engaged with the occupants of the vehicle that he observed alleged signs of nervousness.

As to an officer's observations of signs of nervousness during a traffic stop, the Third Circuit has stated that, "'[i]t is certainly not uncommon for most citizens—whether innocent or guilty—to exhibit signs of nervousness when confronted by a law enforcement officer.'" *United States v. Alvin*, 701 F. App'x 151, 155 (3d Cir. 2017) (quoting *United States v. Wood*, 106 F.3d 942, 948 (10th Cir. 1997). Thus, "[n]ervousness alone is not enough to establish reasonable suspicion." *United States v. Austin*, 269 F. Supp. 2d 629, 632 (E.D. Pa. 2003) (citing *Wood*, 106 F.3d at 947. Accordingly, "nervousness is of limited significance in determining reasonable suspicion." *Wood*, 106 F.3d at 948; *United States v. Beck*, 140 F.3d 1129, 1139 (8th Cir. 1998) (concluding that "suspicion associated with [motorist's] nervous demeanor during the traffic stop to be, at best, minimal"); *United States v. Brown*, No. 4:21-CR-40066-01-KES, 2022 WL 292939, at *7 (D.S.D. Feb. 1, 2022) (nervousness during traffic

stop is of limited significance, especially nervousness due to other [non-criminal] factors or nervousness that is not unusual or exceptional).  In *United States v. Miller*, the Fourth Circuit stated, ""absent signs of nervousness *beyond the norm*, we will discount the detaining officer's reliance on the detainee's nervousness as a basis for reasonable suspicion."  *United States v. Miller*, 54 F.4th 219, 229 (4th Cir. 2022) (emphasis added) (quoting *United States v. Bowman*, 884 F.3d 200, 214 (4th Cir. 2018)).

In this case, the defense's argument concerns whether Officer Brozell's testimony is credible.  The defense does not argue that the signs of nervousness do, or do not, provide reasonable suspicion of criminal activity, either alone or in conjunction with other observed activity.  Officer Brozell testified that the occupants of the vehicle "were all very nervous, exhibiting multiple signs of nervousness, including lack of eye contract, [and] heavy breathing."  Tr. 10.[1]  Similarly, Officer Brozell stated in his report, prepared the day after the traffic stop, that, "all occupants display[ed] signs of nervousness, including rapid breathing, sweating and lack of eye contact."  City of Pittsburgh, Bureau of Police, Investigative Report, Oct. 15, 2021, Def. Ex. A.  However, in Officer Brozell's Affidavit of Probable Cause to obtain a search warrant, prepared the evening of the traffic stop, he did not include any averments regarding his observations of the occupants' nervousness.  Affidavit of Probable Cause, Oct. 14., 2021, Gov. Ex. 3.

The defense argues that the video evidence shows that Mr. Wofford did maintain eye contact, he was not breathing rapidly, and he was not sweating, contradicting Officer Brozell's testimony.  Upon viewing the body cam video at the hearing, according to the

[1] With respect to Mr. Younger, Officer Brozell testified that Mr. Younger "was extremely nervous throughout the entire traffic stop. He failed to maintain eye contact. He was breathing at a rapid rate."  Tr. 14.

defense, Officer Brozell chose not to concede that his stated observations were incorrect, but instead he "doubled down on a position that was so clearly incorrect as evidenced by his own body worn camera footage." Def. Post-Hrg. Br. 6. As stated, if the video evidence contradicts Officer Brozell's testimony, the defense concludes that his testimony as to Mr. Wofford's signs of nervousness is not credible. His credibility is further undermined, according to the defense, because Officer Brozell included signs of the occupants' nervousness in his report, prepared the day after the stop, but neglected to mention signs of nervousness in his affidavit in support of a search warrant, prepared not long after the traffic stop ended. The defense's argument implies that, if Officer Brozell had in fact observed Mr. Wofford's rapid breathing, sweating, and lack of eye contact, he would have included such observations in his affidavit as well as in his later-filed report.

The Court will review the body cam video as to each of the observed signs of nervousness in comparison with Officer Brozell's testimony, in light of the following legal standards. "[W]hen an officer's testimony is clearly contradicted by video evidence, the court should normally discount the testimonial statements." *United States v. Miller*, 54 F.4th 219, 229 (4th Cir. 2022). When a witness's "version of events is so utterly discredited by the record that no reasonable jury could have believed him," the court "should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape". *Scott v. Harris*, 550 U.S. 372, 380-81 (2007). The court should not adopt a parties' version of the facts that is "'blatantly contradicted by the record.'" *Coulston v. Glunt*, 665 Fed. App'x 128, 132 (3d Cir. 2016) ( (quoting *Scott*, 550 U.S. at 380). Testimony that is "completely and clearly contradict[ed]" by "an accurate video recording" is incredible. *Morton v. Kirkwood*,

707 F.3d 176, 1284 (11th Cir 2013).  A trooper's testimony at a suppression hearing that has

been "clearly and affirmatively contradicted" by video evidence is "implausible on its face."

*United States v. Prokupek*, 632 F.3d 460, 463 (8th Cir. 2011).  The above cited cases establish

a high threshold for finding a witness not credible based on video evidence; namely, the video

evidence must 'clearly contradict,' 'completely and clearly contradict,' 'blatantly contradict,'

'clearly and affirmatively contradict,' or 'utterly discredit' the challenged testimony.

### 1.  Rapid/Heavy Breathing

First, the defense argues that Officer Brozell was "unable to point to a single instance

in the video that showed Mr. Wofford breathing heavily."  Def. Post-Hrg. Br. 3.  When

defense counsel reviewied the body cam video with Officer Brozell, the following exchanges

occurred:

> [Defense Counsel]: Can you direct me to at what point Mr. Wofford begins to
> display any rapid breathing.
>
> [Officer Brozell]: That's during the initial contact with –
>
> Q. When you initially approached the car?
>
> A. Correct.
>
> (Playing video)
>
> . . .
>
> Q. What about the rapid breathing?
>
> A. It's hard to see on a body cam, but –

Tr. 27, 28.  Based on the above evidence, the defense argues that there is no video evidence of

rapid/heavy breathing corroborating Officer Brozell's testimony.  Therefore, the defense

argues that Officer Brozell's testimony, that he observed Mr. Wofford breathing

rapidly/heavily, is not credible.

Focusing solely on credibility, the defense's argument does not inevitably lead to a conclusion of incredibility.  Officer Brozell may have observed Mr. Wofford engaged in, what he viewed as, rapid/heavy breathing, but such breathing was not visible upon playback of the body cam video.  Officer Brozell agreed with defense counsel that rapid breathing is not visible on the video, but he qualified his agreement by testifying that, "[i]t's hard to see [rapid breathing] on a body cam [video]."  Tr. 28.  In addition, Mr. Wofford's rapid/heavy breathing rate, as observed by Officer Brozell, may have occurred at the low end of a typical person's rapid/heavy breathing.  Perhaps another officer observing the same rapid/heavy breathing would not have classified the breathing as unusual or as a sign of nervousness.  In either case, the detection of Mr. Wofford's breathing rate may have been such that it was not visible on the video.  *Miller*, 54 F.4th at 229 (based on where officer was standing and resolution and lighting of the video "one would not expect the [body cam] video to show all the details that would likely be visible to the naked eye").

The relevant portion of the body cam video does not show Mr. Wofford's rapid or heavy breathing; but, but the totality of the evidence does not establish that the video evidence "blatantly contradicts" Office Brozell's testimony.  . *Coulston*, 665 Fed. App'x at 132.  Giving due weight to Officer Brozell's experience in conducting traffic stops in a high crime area, and the fact that the video evidence does not 'clearly and affirmatively contradict' or 'utterly discredit' his testimony, the Court cannot conclude that Officer Brozell's testimony on this issue demonstrates that he is not credible.  *United States v. Rickus*, 737 F.2d 360, 365 (3d Cir. 1984) (Court "giv[es] due weight to the experience of the officers" in a traffic stop).[2]

---

[2] "The Supreme Court has stressed that the totality of the circumstances standard enables 'officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative

### 2.   Sweating

Next, the defense argues that Officer Brozell's claim that Mr. Wofford was sweating is also contradicted by the video evidence.  After reviewing a portion of the video, the following exchange occurred:

> [Defense Counsel]:  How about the sweating?
>
> [Officer Brozell]:  I mean I can't tell how much sweat is perspirating off of him right now.
>
> Q. So you can agree with me it doesn't appear Mr. Wofford is sweating here in this video, correct?
>
> A. Correct.

Tr. 28.  Such testimony is hardly evidence of Officer Brozell "doubling down" on his observation that Mr. Wofford was sweating in spite of video evidence to the contrary.  Officer Brozell simply agreed with defense counsel that it did not appear from the video that Mr. Wofford was sweating.  The Court does not view Officer Brozell's testimony as demonstrating a lack of credibility, as such would depend upon concluding as a matter of fact, that the body cam video would have definitely captured Mr. Wofford sweating, if indeed he was.  The Court cannot make that conclusion as to such a subtle and variable phenomenon as sweating.  In addition, based on the temperature in the afternoon of the traffic stop, it is likely that several, if not all, of those present at the traffic stop were sweating.  The Court takes judicial notice that the temperature in Pittsburgh on October 14, 2021, at 4:30 p.m., was approximately 77 degrees.[3]  Such a high afternoon temperature, combined with a motorist's

---

information available to them that might well elude an untrained person.'" *United States v. Thompson*, 772 F.3d 752, 759 (3d Cir. 2014) (quoting *United States v. Arvizu*, 534 U.S. 266, 273(2002)).
[3] *See* https://www.wunderground.com/history/daily/KPIT/date/2021-10-14;
https://www.almanac.com/weather/history/zipcode/15206/2021-10-14;
https://www.weather.gov/wrh/climate?wfo=pbz  ).

expected nervousness during a traffic stop, could readily cause a person to sweat.  Therefore,

it is likely that Mr. Wofford was sweating at times during the traffic stop, and that Officer

Brozell observed it, but that such sweating was not visible on the body cam video.  As with

Mr. Wofford's breathing, the Court cannot find that the video evidence 'completely and

clearly contradicts' Officer Brozell's testimony.  Thus, the Court declines to find Officer

Brozell not credible, based upon his testimony regarding sweating.

### 3.  Lack of Eye Contact

Finally, with respect to Officer Brozell's statement that Mr. Wofford lacked eye

contact, defense counsel and Officer Brozell went over several portions of the body cam

video, with the following resulting exchanges:

> [Defense Counsel]:  . . . Can you agree with me in that video it appears that **throughout your entire interaction, Mr. Wofford was maintaining eye contact**?
>
> [Officer Brozell]:  **Not for the entirety of the video**.
>
> Q. I mean I can certainly replay the video if you recall certain periods that he was not maintaining eye contact.
>
> A. That's fine.
>
>> (Playing video)
>>
>> [Brief exchange regarding "rapid breathing," followed by resumption of the video]
>
> THE WITNESS: You see the **periodic looking forward**.
>
> Q. Okay. So I'll pause it here because you just made a comment.
>
> A. The periodic looking forward, that was determining. **He's not maintaining eye contact while he's speaking to me. He's constantly -- talks to me, looks**

**straight while he's talking, turns back**. So that's what that means in that report.

Q. So because he did not lock in and have eye contact the entire time, that is what you consider as not maintaining eye [contact], correct?

A. Correct.

          . . .

Q. And your statement is lack of eye contact in your report. So to me, I interpret that as not making eye contact at all. Is that not what you meant in your report?

A. I don't recall exactly how much eye contact was -- like I didn't review the body camera to observe. It was just the observations at the time that I dealt with him.

Q. You can agree with me after watching this video, and it's pretty fresh in your memory, that Mr. Wofford and even a passenger there is **making quite a bit of eye contact**?

A. **At times, yes**.

Q. Were there times where he was **completely avoiding eye contact**?

A. Mr. Wofford?

Q. **Yes**.

A. **Yes**. When he was looking -- **when he's looking forward after answering questions while still talking**.

Q. So when he briefly looks in a different direction?

A. Correct.

Tr. 26-29 (emphases added).

Defense counsel is correct that the video evidence does not show Mr. Wofford failing to make eye contact at all. Officer Brozell testified, however, that, to him, "lack of eye contact" meant that Mr. Wofford would periodically break eye contact with Officer Brozell and then look forward. The video confirms that Mr. Wofford did break eye contact with

Officer Brozell at times and look forward. Therefore, the video evidence does not 'clearly contradict' Officer Brozell's testimony. Officer Brozell observed instances of Mr. Wofford periodically breaking eye contact with Officer Brozell, and looking away from him, that Officer Brozell believed indicated a nervousness on the part of Mr. Wofford. It may be that Officer Brozell's observation of "lack of eye contact" does not rise to the level of an unusual or exceptional[4] "sign of nervousness;" but, in deference to his experience, the Court concludes that Officer Brozell's testimony on this issue was credible.

### D.   The Odor of Marijuana

Probable cause is established in this case, based upon Officer Brozell detecting the odor of marijuana coming from the vehicle before he even reached the driver's side door. The defense challenges the credibility of this statement, arguing that, based on his testimony about nervousness, his testimony regarding marijuana odor should not be credited. Moreover, the defense argues the statement should not be credited, because there was only a single small, wrapped, bag of marijuana found in the front console, which does not support a finding that the Officer smelled the odor of marijuana coming from that bag.

The Court did not find that Officer Brozell's testimony as to nervousness was not credible. Thus, such testimony has no bearing on the credibility of his statement that he detected the odor of marijuana. The Court otherwise finds that Officer Brozell's testimony, that he smelled the odor of marijuana, is credible. First, he stated that he smelled the odor of marijuana emanating from the vehicle before he began to talk to, or observe, the occupants.

---

[4] Defendant's signs of "nervousness includ[ing] rigid body posture and staring straight ahead when not engaged in conversation with [the] Officer . . . are not "unusual" or "exceptional" manifestations of nervousness." *United States v. Brown*, No. 4:21-CR-40066-01-KES, 2022 WL 292939, at *7 (D.S.D. Feb. 1, 2022).

Second, he informed Mr. Wofford that he had smelled the odor of marijuana coming from the vehicle, which was consistent with his initial observation.

Third, although only a small, wrapped baggie of marijuana was recovered from the center console, that fact does not undermine Officer Brozell's credibility. In relevant part, the scenario of an officer smelling marijuana inside a vehicle, with the subsequent search not recovering marijuana or recovering only a small amount of marijuana, has been determined to be credible by several other courts. *United States v. Witherspoon*, No. 23-1736, 2024 WL 2891334, at *3 (3d Cir. June 10, 2024) ("no clear error in the District Court's decision to credit the testimony regarding the marijuana odor. The officer also stated that he found marijuana shake (*i.e.,* small, leftover pieces of the plant matter) inside the vehicle but in amounts insufficient to seize"). Also, the "fact that no evidence was introduced that marijuana, burnt or otherwise, was found in the vehicle or on Defendants' persons does not refute the officers' testimony." *United States v. Brounson*, No. 115CR00366ELRJFK, 2016 WL 4472983, at *9 (N.D. Ga. May 23, 2016), report and recommendation adopted, No. 115CR00366ELRJFK, 2016 WL 4472971 (N.D. Ga. Aug. 23, 2016). (explaining that, "burnt marijuana might have recently been in the vehicle or in Defendants' possession while in the vehicle" and noting officer's testimony that, "generally if burnt, no marijuana is left so that a subsequent search does not locate any marijuana"). *See also United States v. Dericho*, 2015 WL 5687766 (M.D. Fla. September 25, 2015) (officer's testimony found credible even though no marijuana was found during the search of the vehicle. Officer "testified that a lack of actual marijuana or related items in the vehicle is not necessarily inconsistent with smelling the odor because the marijuana could have been smoked in the vehicle earlier or the smell

could have been on the defendant's clothing"); *United States v. George*, 2010 WL 431783, at *8 (E.D. Mo. February 2, 2010) (court stated, "in common experience, the pungent odor of any smoked item, even cigarette smoke[,] can linger in a vehicle for quite some time and, thus, a mild odor of burnt marijuana could be smelled by the officers for a significant period of time after the marijuana had been smoked"); and *United States v. Williams*, No. CR 17-246, 2023 WL 3407685, at *28 n. 23 (W.D. Pa. May 12, 2023) (because officer retrieved only a baggie of marijuana from defendant's persons, officer's testimony that he smelled the odor of marijuana emanating from the vehicle is not "unworthy of belief").

Finally, Officer Brozell's detection of the odor of marijuana coming from the vehicle was corroborated by Officer Gardocki during the search of the vehicle.  Tr. 17-18.  The video of the search of the vehicle shows Officer Gardocki searching the interior of the passenger side.  When he opened the glove box, he recovered a plastic bag that appeared to contain a controlled substance.  He spontaneously remarked, "Ahhh, there we go."  Body Cam Video 00:46-00:49.  As he places the baggie on the passenger seat, he begins to say, "I was going to say I smelled the wee-- . . Oh, I was going to say weed, that's not weed.  I was like, 'I smell it.'"  Body Cam Video 00:50-00:56.   A little later during the search, after recovering more heroin, Officer Gardocki spontaneously says, "I smell weed back here"  Body Cam Video 2:37-2:40.

Based on the above, the Court finds Officer Brozell's testimony, that he smelled the odor of marijuana coming from the vehicle, credible.  Officer Brozell smelled the odor of marijuana as he approached the vehicle, before encountering any of the occupants.  He told Mr. Wofford several times that he smelled the odor of marijuana.  The small amount of

wrapped marijuana recovered from the vehicle does not diminish Officer Bromell's credibility.  Finally, the smell of marijuana persisted in the vehicle hours later, at the time of the search, as evidenced by Officer Gardocki's spontaneous statements that he smelled weed, which also corroborated Officer Brozell's testimony.

Given that the Court finds that Officer Brozell smelled the odor of marijuana immediately upon approaching the vehicle, probable cause was immediately established. Therefore, "we need not locate [the *Rodriguez*] moment," because"[f]rom the moment officers approached [Mr. Wofford's] car and detected the odor of marijuana, they possessed at least reasonable suspicion to prolong the stop and investigate non-traffic-related crimes.  Indeed, the smell of marijuana 'establish[es] not merely reasonable suspicion, but probable cause.'" *United States v. Colvin*, No. 23-2041, 2024 WL 3023178, at *2 (3d Cir. June 17, 2024) (citing *United States v. Green*, 897 F.3d 173, 186–72 (3d Cir. 2018) and quoting *United States v. Ramos*, 443 F.3d 304, 308 (3d Cir. 2006)).  Accordingly, Officer Brozell, along with his fellow officers, had, at a minimum, reasonable suspicion to believe criminal activity was afoot, and, in fact, the officers had probable cause to further investigate the occupants for evidence of criminal activity, and to search the vehicle.

**E.    Frisk of Mr. Wofford after Firearm Recovered from Mr. Younger**

Even with probable cause to search the vehicle, the defense maintains that the pat-down of Mr. Wofford was a separate and distinct Fourth Amendment violation, which justifies suppression of all physical evidence recovered from Mr. Wofford.  The defense first argues that Officer Brozell testified that, when he asked Mr. Wofford to accompany him to the rear of the vehicle to talk, he had no reason to believe that Mr. Wofford was armed and

dangerous.  Next, the defense argues that the fact that a firearm was recovered from Mr.

Younger should play no role in justifying a pat down of Mr. Wofford, because whether Mr.

Wofford was suspected of being armed and dangerous must be based on facts specific to Mr.

Wofford.  *Ybarra v. Illinois*, 444U.S. 85, 94 (1979).

      If an officer reasonably suspects that the driver of a vehicle, who has been removed

from the car, is armed and dangerous, the officer may conduct a brief frisk of the individual

for weapons.  *Pennsylvania v. Mimms*, 434 U.S. 106, 111-12 (1977).  When "evaluat[ing] the

reasonableness of a particular search or seizure in light of the particular circumstances . . . it is

imperative that the facts be judged against an objective standard: would the facts available to

the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in

the belief' that the action taken was appropriate?"  *Terry*, 392 U.S. at 21–22 (citations

omitted).

      The Court finds no Fourth Amendment violation in this case.  Officer Brozell smelled

marijuana from the outset; and therefore, had probable cause to search the vehicle.  Officer

Brozell had to secure the vehicle while he waited for a search warrant.  This required the

removal of all three occupants from the vehicle.  Mr. Wofford had already been removed, so

that Officer Brozell could talk to him at the rear of the vehicle about the suspected odor of

marijuana.  Officer Brozell did not suspect, at that time, that Mr. Wofford was armed and

dangerous.  Subsequently, upon removal of Mr. Younger from the vehicle, Officer Brozell

recovered a firearm from Mr. Younger's fanny pack.  Mr. Wofford wore a similar fanny pack.

Mr. Wofford was told he was being detained because the police had recovered a firearm from

Mr. Younger.  In fact, it was not simply Mr. Younger's firearm that justified a pat down of

Mr. Wofford.  The totality of the objective facts known to Officer Brozell at the time he

conducted the pat down of Mr. Wofford support the reasonable belief that Mr. Wofford may

be armed and dangerous.  *United States v. Cortez*, 449 U.S. 411, 417 (1981) (reasonable

suspicion is evaluated under "the totality of the circumstances—the whole picture—must be

taken into account").  Officer Brozell was on patrol in a neighborhood where a shooting had

occurred the night before.  He was specifically patrolling in the area, based upon the

Pittsburgh Police's decision to increase patrols in that area.  Tr. 4 ("We were doing more

patrols of the area because of a recent shooting that had occurred the previous night. So, they

wanted us out and about in the area, patrolling").  Notwithstanding the specific shooting

having occurred the night before, Officer Brozell was patrolling in a high crime

neighborhood.  Tr. 5 (It's a "very high crime area, particularly in violent crimes. . . . It's also a

known area of open air narcotic transactions").  In addition, the vehicle Mr. Wofford was

driving had heavy tint on the windows.  Officer Brozell smelled the odor of marijuana

emanating from the vehicle as he approached the driver's side, before he knew who was in the

vehicle.  With the odor of marijuana and then a firearm found on one of the occupants, the

association between drugs and weapons arose.

  In this case, in light of the odor of marijuana, the presence of a firearm on a passenger,

the high crime neighborhood, and the fact that there was a shooting the night before, for the

safety of the public and of the officers, Officer Brozell objectively had reasonable suspicion to

conduct a search of Mr. Wofford's person.  *United States v. Moorefield*, 111 F.3d 10, 12 (3d

Cir. 1997) ("police officer may order the driver of a lawfully stopped car to exit the vehicle")

(citing *Pennsylvania v. Mimms*, 434 U.S. 106 (1977)). Viewing the events under the totality of the circumstances, the Court concludes that there was no Fourth Amendment violation.

## V.  Conclusion

For the reasons stated above, Mr. Wofford's Motion to Suppress Physical Evidence (ECF No. 68) is DENIED.


Dated: <u>August 22, 2024</u>

Marilyn J. Horan